OPINION
{¶ 1} Katherine Davis appeals from a decision of the trial court finding her in contempt for her violation of the parties' divorce decree regarding her ex-husband Jaime Mendez's visitation with their son. She also appeals the trial court's order clarifying the means of communication for her and Mendez to use when arranging visitation, so that the terms of a pre-existing domestic violence civil protection order are *Page 2 
not violated. For the following reasons, the judgments of the trial court will be affirmed.
 I {¶ 2} Katherine Davis and Jaime Mendez were married in Greene County, Ohio on September 29, 1990. Their son, D.M., was born on May 19, 1997. The couple spent most of their married life in Mexico City, Mexico. In 2005 Davis brought D.M. to live in Ohio, while Mendez remained in Mexico. On August 22, 2005 Davis obtained a domestic violence civil protection order against Mendez based on violence that occurred in the marital home in Mexico City. On July 6, 2006 Mendez entered into a consent agreement, which was set to expire four years later. Pursuant to that order, Mendez and Davis are permitted no contact with each other. Nevertheless, Mendez was to receive two-hour visitations with the couple's son, D.M., to be supervised by the maternal grandfather.
 {¶ 3} Davis also filed a complaint for divorce on July 6th . A final judgment and decree of divorce was filed on December 3, 2007. Under the terms of the divorce decree, Mendez is required to provide Davis with written proof that he has deposited his passport with the Greene County Clerk of Courts before any visits with D.M. He is also required to post a $5,000 bond if he intends to take D.M. out of the state of Ohio. Mendez is allowed 6 weeks visitation during the summer, as well as time during D.M.'s Christmas and spring breaks. Additionally, any time Mendez is in Ohio, after giving 72 hours notice to Davis of his intent to visit with D.M., Mendez is permitted to pick his son up and drop him off at the curb in front of Davis's home. Neither party appealed from the decree.
 {¶ 4} On Christmas day 2007, Mendez arrived in Ohio. The following morning *Page 3 
he and a friend, Jeff Sutter, went to the clerk's office to surrender Mendez's passport. The clerk gave Mendez a receipt, which he took to his attorney's office. Mendez's attorney, Jay Adams, called Davis's attorney, David Mesaros, in an attempt to arrange a visit. Mesaros advised that he no longer represented Davis and claimed that he had no current address or phone number for her. Mendez returned to the clerk's office, but he was unable to obtain a current address or phone number for Davis. Mendez next went to the Bellbrook Police Department with a copy of the divorce decree and the receipt for the deposit of his passport. Mendez spoke with an officer, who advised Mendez that he would attempt to make contact with Davis.
 {¶ 5} On December 31st the officer spoke with Davis at her home. The officer told Mendez that Davis refused to allow him to visit with their son. The officer advised Mendez not to go to the home and that the police would try to straighten it out. On January 2, 2008 police called Davis, who continued to refuse visitation.
 {¶ 6} In the meantime, Mendez had called the airline to extend his stay, in the hopes of seeing his son before returning to Mexico. However, Mendez remained unable to find an address or phone number for Davis for the remainder of his stay, and he was unsuccessful in scheduling a visit through his attorney, the courts, or the police.
 {¶ 7} On January 10, 2008 Mendez filed a motion to show cause alleging that Davis had failed to follow the terms of the parenting time awarded to him in the divorce decree. At a hearing later that month, Davis denied that she ever prohibited the visitation. Instead, she first insisted that there was information that she needed clarified before she could allow the visit. For example, although the officer told Davis *Page 4 
that Mendez had surrendered his passport, she was not provided with written proof. Also, the officer could not tell her at exactly what time Mendez would pick up or return D.M. She then claimed that since nobody had given her a time, she expected Mendez to arrive 72 hours after she received notice on December 31st . Davis concluded that she did not deny visitation because Mendez did not arrive to pick D.M. up on the afternoon of January 3, 2008.
 {¶ 8} Davis admitted that she knew, through both the Bellbrook police and Mesaros, that Mendez was trying to give her the necessary 72 hour notice before visiting with D.M., yet she did nothing to facilitate that visitation. Davis also conceded that she has made every attempt to keep her address out of all court records. Mendez obtained a copy of the police report regarding the officer's contact with Davis. From that document, Adams, Mendez's attorney, learned Davis's address in order to serve her with the contempt motion on behalf of Mendez.
 {¶ 9} The trial court found Davis in contempt and ordered a 10-day sentence, to be suspended on her cooperation with two periods of visitation during the weekend following the hearing. The court also ordered Davis to pay $1,200 to Mendez as reimbursement of part of his airline expenses and attorney fees, said amount to be credited to Mendez's child support account.
 {¶ 10} Davis filed a timely notice of appeal. During the pendency of that appeal, the trial court sua sponte issued a "Judgment Entry Clarifying Parenting Time Exchanges" on February 25, 2008. The clarifying judgment modified the civil protection order, not the divorce decree. The trial court acknowledged the potential for conflict between the protection order, which prevents any contact between Davis and *Page 5 
Mendez, and the divorce decree, which allows for visitation between Mendez and D.M. The trial court ordered that all future visitation arrangements be made indirectly through an internet service, ourfamilywizard.com, which could be monitored by the court. Davis appealed from this order as well, and the two appeals were consolidated.
 II {¶ 11} Davis's first assignment of error is as follows:
 {¶ 12} "THE TRIAL COURT ERRED IN FINDING APPELLANT IN CONTEMPT OF THE PARENTING TIME PROVISIONS OF THE FINAL JUDGMENT AND DECREE OF DIVORCE WHEREIN APPELLANT FOLLOWED THE EXPRESS TERMS OF THAT DECREE AND THE COURT LATER DETERMINED THAT THE DECREE ON ITS OWN TERMS WAS CONFUSING."
 {¶ 13} In her First Assignment of Error, Davis argues that the trial court erred in finding her in contempt of the visitation order. The standard of review of a trial court finding of contempt is abuse of discretion. State ex rel. Ventrone v. Birkel (1981), 65 Ohio St.2d 10,417 N.E.2d 1249, citation omitted. A finding of an abuse of discretion means that the trial court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140. We find that the trial court, having seen Davis's demeanor and having heard her tone of voice (to which the court specifically referred), did not abuse its discretion in finding Davis in contempt for thwarting Mendez's attempts to visit with D.M.
 {¶ 14} Davis contends that she was not required to violate the terms of the protection order just so that she could arrange for visits between D.M. and Mendez as established by the divorce decree. However, as the trial court found, Davis clearly had *Page 6 
no intention of permitting the visitation, and she did everything that she could to prevent it. Any reasonable individual in her position, once she knew that Mendez wanted to see his son, could have worked something out regarding the visitation rather than refusing it and then hiding behind the protection order as an excuse to deny it. For example, Davis could have used the Bellbrook police, as suggested by the court, a mutual friend, or a family member to make the arrangements without herself ever having direct contact with Mendez.
 {¶ 15} Davis also maintains that she never refused visitation because Mendez did not come to pick D.M. up on the afternoon of January 3, 2008. Even assuming that Mendez was aware of exactly what time the police visited Davis, so that he could arrive precisely 72 hours later, this ignores the fact that Mendez was not able to find out where Davis lived. In fact, Davis admitted that she had made every effort to avoid having her address made available to Mendez.
 {¶ 16} Because Davis chose not to make any attempt to facilitate the court-ordered visitation between Mendez and D.M, but she instead actively and intentionally prevented that visitation, the trial court did not abuse its discretion in finding her in contempt. Accordingly, Davis's first assignment of error will be overruled.
 III {¶ 17} Davis's second assignment of error is as follows:
 {¶ 18} "THE TRIAL COURT ERRED IN ISSUING A `CLARIFYING ORDER' TO THE FINAL JUDGMENT AND DECREE OF DIVORCE WHICH HAD ALREADY BECOME A FINAL ORDER AND HAD NOT BEEN APPEALED AND THEREBY MODIFIED PROVISIONS OF THE FINAL JUDGMENT AND DECREE WITHOUT *Page 7 
AUTHORITY AND IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS."
 {¶ 19} Davis maintains that the trial court did not have the authority to sua sponte issue an order changing the terms of visitation that were established in the divorce decree. At the outset, we repeat that the clarifying judgment modifies the civil protection order, not the decree. Because the trial court has continuing jurisdiction over visitation, and because the trial court did not alter the terms of visitation as established by the divorce decree, Davis's second assignment of error will be overruled.
 {¶ 20} Even after the issuance of a final divorce decree, the trial court has continuing jurisdiction to modify matters relating to the custody, care, and support of children. Braatz v. Braatz,85 Ohio St.3d 40, 50, 1999-Ohio-203, citations omitted. This includes orders of visitation. Although we agree with Davis that modification of visitation should be accomplished only after notice and hearing, in this case, the trial court ordered no change in the visitation established by the divorce decree. There was no modification of the parties' substantial rights. Instead, the court merely sought to reconcile the protection order's no contact provision with the necessity of arranging for the court-ordered visitation provided for in the divorce decree.
 {¶ 21} The trial court's order does not change the frequency or length of visits, nor does it negate the requirements that Mendez give 72 hours notice of his intent to exercise his visitation rights, surrender his passport, or post a cash bond for out-of-state visitation. The clarifying order was merely intended to establish a means of supervised, indirect communication between Mendez and Davis in order to schedule the visits that had already been ordered. The trial court's order removed the obstacle *Page 8 
of the protection order's no contact terms, terms that Davis chose to use in order to thwart Mendez's attempts to visit with his son.
 {¶ 22} It was Davis's complaint that she was confused that led the trial court to issue the clarifying order. In other words, because Davis chose to make it nearly impossible for Mendez to schedule visits with D.M., the trial court issued an order specifying a supervised means of indirect communication between Mendez and Davis. That order did not change the visitation, it merely sought to avoid similar problems in the future.
 {¶ 23} Davis's second assignment of error will be overruled.
 IV {¶ 24} Both of Davis's assignments of error having been overruled, the judgment of the trial court is affirmed.
FAIN, J. and WALTERS, J., concur.
(Hon. Sumner E. Walters retired from the Third District Court of Appeals sitting by assignment of the Chief Justice of the Supreme Court of Ohio). *Page 1